We have one case on the calendar this morning, which we're going to have it argued as two, appeal and cross-appeal, and we will not ask you to switch places unless you want to. The cases are Chamberlain Group v. ITC and Tektronik, 2018-2002, 2191, Ms. Vidal. Thank you, Your Honor. May it please the Court, Kathy Vidal, on behalf of Chamberlain. There are two issues in the first appeal I'd like to address today. The first is the claim construction of the terms automatically indifferent, where the Commission imported limitations into those claims and elevated policy over the contextual interpretation of the claims in violation of Smith-Kline. And the second relates to whether this Court should remand for a 101 consideration should this Court correct the claim construction and find infringement. On page 29 of the red brief, the ITC says that there's no dispute that the accused TTI products infringe the 319 patent under the construction of wall console patent disavowal. Do you agree that if there's no disavowal, TTI's products infringe? I do, and that's for the 319 patent, is that correct? Yeah. I believe this appeal that we're speaking about is a 336 patent, but I do agree with that. Okay. I hope you're also going to address this other issue, which the AHA decided in your favor about the monitoring of these one parameters. Yes, Your Honor, I will address that as well. If you'd like, I can address that first. Whatever you want. Okay, okay. So why don't I start with the 101 issue, and then I'll move on to claim construction, and I'll address that as well as the other two terms. How does Judge Chen's recent opinion impact? Judge Chen's recent opinion in the Chamberlain case? Uh-huh. So interestingly, that is a case where Chamberlain is going to move for en banc review because in that case, it actually very much aligns with this case. In both cases, there were findings below that the patent claims were nonobvious. In that case, the jury also found the patent claims novel. At the same time, in that case, the court decided to make those Alice Step 2 decisions itself, the factual findings itself, and that is an issue on which Chamberlain is going to seek additional review. In this case, we've got the same scenario where the ITC, the ALJ, actually made a determination on 101. That was vacated by the commission. So as that issue rises to this court, under Alice Step 1, that's a legal issue, and this court could certainly find that the claims are patent eligible under 101 without remanding. But if this court does move to a Step 2 inquiry, like the court did in the prior case, it's really incumbent upon this court to remand the case for further consideration under MyMail, under Atrix, and under the series of cases that MyMail cites, including Atlantic Thermoplastics. That is because of incumbency in the eyes of the beholder. That is correct. It's incumbent in the eyes of Chamberlain, and that's going to be the issue of the en banc and panel rehearing petition that will be submitted in two weeks in that case. What's the 101 issue? Whether we should decide it now if we rule for you on infringement or whether we should remand it? Is that the issue? That is correct, that both TTI and the ITC have stated that this court should automatically remand for consideration of the 101 issue. It is Chamberlain's position that remand isn't necessary, but that's only if this case resolves the 101 issue on Alice Step 1. If this court does move to Alice Step 2, then Chamberlain would agree with the ITC and the commission that those factual findings need to be determined for the first instance by the trier. Okay. I think you do well to turn to the infringement issue. Thank you, Your Honor. In terms of the infringement issue, there's three claims at issue. The first one is automatically. Talking about the monitoring thing, it seems to me that the A.J. got that wrong because the voltage input is not a sole determinant of force, right, because you also need current. So in terms of Wait, wait. Answer my question. Is that true? That the voltage The voltage input is not the sole determinant of force that you also need to measure current. Isn't that correct? It's a factor. It is some evidence of the force. Voltage is a factor. It's a factor. It's not a sole determinant. It's not a sole determinant. It's not. It's not. There are other factors that are considered in the equation. That's correct. So voltage is not the determinant. Voltage is, it is a factor that is considered and it is an indication of the force, and so it meets the claim limitations because it's an indication. It's not the only indication. It's not just an indication of the force when the force depends on other factors as well. It depends. There's not a one-to-one correspondence between voltage and force, right? There is a relationship between voltage and force, but you're right. The other parameters could change and that could impact the reading of the force, but it is a factor that is indicative of force depending upon whether the other factors are set. So voltage, it's one of the factors that the ALJ found related to force. Is there an equation where a constant is involved? In terms of the relationship between voltage, there are other parameters as well that can vary, and there's not a one-to-one correspondence, but that's not required by read. Do you agree that if we determine that voltage doesn't correspond to force, then we need to claim that there's no infringement? If this Court agrees that voltage does not meet the claim limitation, if it doesn't meet the limitation of the claim, then, of course, there's no infringement. Moving on to automatically, which is one of the other terms that the ALJ construed, for automatically, the Court construed that as always or guaranteed. In terms of that construction, the Court determined that automatically had to have some meaning in the claim and that if the Court did not construe, if the ALJ did not construe the term as always or guaranteed, then that term would be superfluous and would have no meaning. That is not the case. If the term automatically were removed from the claim term, then the claim term would basically read on the prior art because the entire claim could be performed manually. So that basis on which the Court determined that automatically meant always or guaranteed had no basis. The second basis on which the Court determined that automatically meant always and guaranteed was because the Court determined that for automatically to happen in response to a parameter, it had to always happen in response to a parameter or there wouldn't be the appropriate relationship. And on that, I'd like to direct this Court to an analogy. In a garage door opener, everyone would concede that the garage door opener opens the garage door automatically. You push the clicker and the garage door opens. You push it again and it returns. But it doesn't happen all the time. In fact, in the 1990s, there were beams installed. It opens the door mechanically. It doesn't necessarily open the door automatically. When the button is pushed, the response is an automatic response where, yes, mechanically the garage door opens or closes depending upon its initial position. So that is an ordinary definition of the term automatically. It doesn't have to open it all the time to meet the automatically definition, and it's the same corollary here. For example, with the garage door— Isn't that manual? The signal is an automatic signal in the analogy, and it's the same here where it's less automatic, and I would submit, Your Honor, that it's less automatic than automatically is used in the claims. In the claims, the term automatically is used to update the characteristic force. It has to deal with some intervening obstruction, and it automatically then does not continue to move. Isn't that correct? In my analogy, that's correct. As opposed to your initial description was someone pushes the button. Correct. The purpose of using the analogy is that in the claim term, the term automatically is used to connote that the process, the force is automatically updated as you go forward, but it doesn't have to automatically increase every single time. It doesn't have to do it always, and that doesn't have to be a guaranteed result. The reason for that is, and the patent discusses this, that there may be certain circumstances in which you would not want the force characteristic to update. For example, you might have a very heavy garage door, and that may be shaking as it descends, and in that case, you'd want to postpone that analysis. So the fact that automatically doesn't happen every single time is not a basis to import limitations into the claim and to say that the term automatically has to mean always and guaranteed versus without human interaction. Thank you for your time. If there isn't any rebuttal time, we can save it for you. Thank you, Your Honor. Mr. Gretchen for the commission. Yes, thank you. May it please the Court, discussion so far has focused almost entirely on claim construction. However, the ALJ was never asked to actually construe these claims. Both parties essentially relied on the plain and ordinary meaning of the claim terms, and so what the ALJ did was apply the plain and ordinary meaning in the context of this patent. In particular, so let me say that this is not a case for de novo review. It's for review for substantial evidence regarding the second part of the infringement analysis, and there is substantial evidence to support both the commission's findings regarding this term, different, the application of that term, and the application of the automatically phrase. I want to start with different because we've heard a lot about automatically so far. Chamberlain's own expert admitted that the accused products do not use different processes to increase the characteristic force value or decrease that value. Chamberlain's expert admitted they use the same function, using essentially the same contents of the lines of code, to both increase and decrease the force value when that first or second condition is met, and that's in the appendix pages 13073 to 77, hearing transcript 181, line 1, 183, line 9, page 189, line 7 to 19, and page 196, line 12 to 197, line 1. So these admissions constitute substantial evidence that the accused products do not use different processes for increasing or decreasing these force values. Chamberlain didn't discuss the conditions that the differences that they allege make the processes different, but I want to briefly go through them. For example, Chamberlain alluded in its brief that the timer is somehow a difference between these processes. The timer, however, only predates or starts the process. It starts the process. Yeah, it starts the process, but it's not part of the process itself, and again, their experts admit to that. Chamberlain referred to the motor phases. Those are also conditions that start the processes. They are not part of the process itself. And as for the offsets that Chamberlain discusses in his brief, those are added to the force value after it's determined. It's not part of the calculation of the force value. Let me then turn to the substantial evidence that supports the Commission's findings that the accused products do not automatically increase or automatically decrease the force value. What counsel left out today is that the claim refers specifically to increasing or decreasing the force value when a specific condition is met. And these are algorithm-based claims. For example, I can figure six, which is on appendix page 721, and discussed in columns seven and eight of appendix page 737. You know, algorithms are basically sets of instructions, maybe mathematical operations or if-then statements or so forth. So in that context, when a condition is met triggers a specific result, and figure six gives an example of that. In this case, however, Chamberlain admits on page 58 of its reply brief that applying the same monitored parameter and condition to the same determination process can yield contradictory results. Its expert, Dr. Doreen, also testified that the characteristic force value may increase, decrease, or stay the same when the same conditions apply to the same determination process. And that's in the appendix pages 13078 to 80, hearing transcript page 200 line 3 to 203 line 15, and 204 line 1 to 207 line 20. So these admissions, again, constitute substantial evidence that the accused products do not increase or decrease the force value when that specific condition is met. We can talk a little bit about BRODCOM, because that was discussed at length by the ALJ. BRODCOM is not a case about claims instructions, much as it is about infringement. And it simply stands for the proposition that if you find infringement, then finding a non-infringing mode of operation or non-infringing feature does not defeat infringement. But it's worth noting that even in BRODCOM, it recognizes that some claims can use broad language, like corresponding. Some claims can use more specific language, like equal to. This is a case that's closer to an equal to type situation. When a condition is met, then a specific result follows. Chamberlain, however, as I said, admits that different results can follow from the same conditions, the same parameter, using the same process. Before you run out of time, would you address the monitoring issue that we discussed? It seems to me it's a pretty good argument that the Commission got that one wrong and that voltage does not correspond to force. Right. First of all, we have two independent bases for non-infringement, which I just discussed. Regardless of how the monitor parameter comes out. But as far as the monitor parameter, specifically that parameter is what's called the UC work step. Voltage does not correspond to force, right? But in this case, what Chamberlain's identified is that parameter is the motor phase. It's a phase of a motor. It's an instruction in the code. Now that instruction may correlate to a voltage. I'm trying to answer my question. Voltage does not correspond to force because force depends on current as well, right? Yes, but there is, if not a one-to-one correspondence, at least a general correspondence that with for a given voltage and everything else staying the same, there can be a correspondence. It affects, but it doesn't correspond. I would agree it affects, and I think affects can indicate a correspondence if there's a general correlation. In the time I have left, I'd just say on the one-to-one issue, this Court's held many times that if the Commission does not reach a final determination on an issue that's not going to affect the outcome of the violation finding, then the proper procedure is to remand the case back to the Commission to make a determination on the issue if it reverses the violation finding. Thank you very much. Thank you, Mr. Bretscher. Mr. White. Good morning, Your Honors, and may it please the Court. Let me pick up with your questions, Judge Dyke, on the alternative grounds for affirmance. So I think you hit the nail on the head with that one, is the thing that Chamberlain identified as the monitored parameter is not indicative of force. In fact, it's not even a monitored voltage. So the thing that they identified as the monitored parameter is actually a number that just counts up from 0 to 17 every time the door opens or closes. It's a number that goes 0 to 17 each and every time regardless of whether the door is going up or going down. It indicates, as Mr. Bretscher said, a phase of the motor. Putting that to one side, the voltage corresponds to force, right? I don't even think that's the argument. I think that they're trying to say is that, and the judge, if you look at the initial determination from the judge, is you have some indication, some indication of what the force may be based upon the number of the UC workstep. It's not even based upon a monitored voltage. He's just saying you have some idea as to what the force may be. But there's evidence and testimony from both experts that there's no correlation between the number of the UC workstep, which just tells you about the motor phase, versus the force applied. We covered that in our brief. Dr. Doreen admitted that. He admitted that was Chamberlain's expert. It's just a number that sequences regardless of the direction of travel. The numbers never change. They always go 0 to 17. And he said that there's established in the code at the time of the writing that there's just simply no correlation whatsoever between the UC workstep and the amount of force applied at any given time. So I think you're right on the money there in that the commission got that one wrong, and that's a separate independent basis to affirm the decision in our favor. Any other questions on that for you, Your Honor? Sounds like no. Please proceed. Thank you. So I want to then turn to the issues of both different and automatic, which are the other two issues that were raised in this case. I think Mr. Brescher addressed the issue of the difference in the code being no difference at all. It's the exact same function that performs the process of either increasing or decreasing every time you go through there. He also addressed the fact that the UC workstep number and the timers are issues that go into the condition, whether the condition's met. They have nothing to do with the actual process for increasing or decreasing. The only other thing I wanted to touch on there was there was another issue that was raised in Chamberlain's reply brief for the first time, and this was on page 67, that they say the accused processes use different sources for computing the offset. It wasn't something that they raised for the ITC, and it wasn't something they raised in their opening brief, so we think that they've waived or forfeited that argument. But if you have any questions or concerns about that, I think they can be remedied very easily. The excess force threshold value is what is actually relevant to the offset. The offset is not used to calculate the characteristic force value, which is at issue here. So if you look at the claims, there's actually two different things. You increase or decrease the characteristic force value, and then a later requirement in the claim is that you then calculate an excess force threshold value. So there are two different things, and Chamberlain's expert before the ITC said that the offset value is only relevant to calculating the excess force threshold value. It had nothing to do with the characteristic force value. So you can see the difference in appendix 744, column 21, lines 1 through 2. That's where it deals with what that actual excess force threshold value is. And then if you look at Chamberlain's pre-hearing brief, which is appendix 9699, there they say that only after the expected value is loaded into the force-back data is the excess force threshold generated by summing force-back to the offset. So at appendix 9699, Chamberlain said that the way that the offset is used is to calculate the excess force threshold. It's not used for the characteristic value here. So I just want to clear that up and make sure that there's no confusion about that. Both experts agreed on this. If you look at appendix 27222, that's where Chamberlain's expert, Dr. Doreen, explained how the offset's used, and it's only used for the excess force threshold. And then our expert, Dr. Heppe, testified the same at appendix 29363. I want to turn now to the automatically term. We believe that Chamberlain's interpretation without human intervention obviously was waived. As Mr. Brescher said, it wasn't an issue that was raised below, wasn't addressed below, and therefore they waived it. In their reply brief at page 49, Chamberlain argues that it did contest the meaning of automatically, and it includes a passage from its pre-hearing brief, which they cite to as appendix 9698. But if you look, I think that argument and that citation are misleading, because the very next sentence in their pre-hearing brief, again at appendix 9698, says, the Federal Circuit has ruled time and again that infringement does not need to occur all of the time. And then the citation that they have is to Broadcom and others. So it's clear that in that portion, in its pre-hearing brief, Chamberlain was advancing its part-time infringement argument. It wasn't raising the claim construction issue presented here for the first time, and it certainly wasn't proposing the claim construction that we've seen here for the first time in this appeal. So again, we believe that issue has been waived, has been forfeited, and even the section that Chamberlain cites in his reply brief does not support that it preserved that issue. Unless there's any other questions, I'm going to cede back the rest of my time. Thank you, Mr. White. Thank you. Ms. Riddell has a couple of minutes of rebuttal time. Thank you, Your Honor. I'd like to address three points. I first wanted to get to the point about voltage and force and the relationship. And the reason I struggle with that question is because it's not force per se. It's force of the actual motor of the garage door opener. And if you look at the determination by the ITC, the ITC found credible testimony, and I'm reading from APPX 152, from both parties explain that if one is given the value of UC work step, which was the parameter in the claim, one would have some idea of the current over time, which is applied to the motor, and thus an idea of the average force. So this was a determination made based on testimony before the ITC to which we would ask... Some idea. That's correct. And that's all that's required by the claim. The claim says monitoring at least one parameter that corresponds to the force. So the current going into the motor does impact the force of that motor, and that is what the ITC determined. Yeah, but impact and correspond don't mean the same thing. It's not a... There are other parameters to the point about are there other inputs, whether they're constants or otherwise, there are. But there was a correspondence, and that's what the ALJ found, and that's what the commission affirmed. The two other points I wanted to address were just raised by Mr. White. One of them related to this so-called late discussion about the definition of automatically. That arose in a very interesting way procedurally where it sounded like the position that was being taken initially by TTI was that there was no infringement because there was only infringement sometimes. So it sounded like an infringement position. It evolved into a claim construction position. CGI all along, once it evolved, took the position that automatically meant without human intervention, and that was raised to the ITC, not first time on appeal here. As to the code and whether it is different or not, if this court turns to the yellow brief at pages 65 to 66, it's very clear that the code is different when it actually comes to the process for increasing and decreasing the parameter. As to the point about the offset, it was mentioned here that that was first raised on appeal. That is not the case. If this court turns to the yellow brief at 68, you'll actually see an exhibit that was used below, and at the very bottom portion of that exhibit, you will see that the offset is different in the increasing determination process versus the decreasing determination process. Thank you, Ms. Vidal. Thank you. We will now move to the cross appeal. And we'll hear from Mr. White. Thank you, Your Honors. Claim terms need not be given their plain and ordinary meaning when the patentee disavows the full scope of the claim term in the specification or during prosecution. In the green brief at 16, you say the parties fully briefed and argued the construction of the term wall counsel. Where? We looked in the record, and I don't see a full, fully briefed. So we did. We had a claim construction process before the ITC. The judge issued a claim construction ruling finding that the wall counsel required the passive infrared detector. I'll see if I can find that for you in the appendix. Maybe I'll ask Will if he could look for that in the appendix. So we did argue we had a full claim construction hearing before the ITC judge. He issued a ruling on that, and then we moved for summary determination of no infringement based upon that. That was appealed to the commission, and then the commission changed that decision, said the wall counsel did not have to include the passive infrared detector, and then we were back before the judge and then had a hearing, full hearing on it. Okay. What was the effect of the board recently issuing a final written decision finding all but two of the dependent claims at issue invalid? So what is the effect for this? For this appeal. For this appeal? Because you mentioned it. Correct. So I think the issue on this appeal is that we've got still, they're going to try to say that the original version of the product infringed based upon the wired connection. I think that the board decision deals with some of that, but they left two claims in play, claims eight and 16 that required power to go from the head unit to the wall counsel, and that did happen in the original version of the product. So I think for the redesigned product, which the commission has now found does not infringe, I don't think that the board decision really affects that, but for this appeal, dealing with the original version of the product, it still has some effect. That is still in play. Now, your appeal here is to the effect that wall counsel includes passive infrared detector. Correct. And your justification for that is? Our justification is... We don't add language to claims. Correct. Understood. But if you look at the cases like PolyAmerica, like Ultimate Pointer, where you've got repeated statements throughout the specification saying that something is required, saying that something distinguishes the claims over the prior art, those statements, in effect, result in a disavowal of the claim scope. And we have that here. We have every single embodiment referring to a wall counsel with a passive infrared detector. We have the background of the invention disparaging not a design that didn't have an infrared detector, but disparaging a design that had an infrared detector in the head unit. So the distinction was not between no infrared detector and an infrared detector. The distinction was whether you have it in the head unit or in the wall counsel. So if you look at the abstract, for example, you can start at the beginning of the patent. The abstract mentions that an infrared detector is in the wall counsel. You go to the background of the invention, it disparages prior art systems that had the infrared detector in the head unit. It talks about the advantages of having it potentially in the wall counsel. The summary of the invention, let's start there. The very first sentence of the summary of the invention says a passive infrared detector for a garage door opener. And then it goes on to say that the infrared detector is contained in the wall control unit. So if you are looking at this, what does this patent cover? You look at the summary of the invention, the very first words, the very first sentence emphasize the importance of this passive infrared detector. If you look at the description of the drawings, it says figure one is a perspective view of a garage, including a movable barrier operator, having associated with it a passive infrared detector in a wall control unit, and embodying the present invention. Now there is a patent in this family with I think the same spec that had infrared detector in the title. And that is not in this title. What is the effect of that? That's correct. And that's the parent patent. It actually had it in the claims as well. So I don't think that that has an effect here in meaning that it can't, that doesn't mean that the claims here can't require it. Excuse me. And in fact, there's case law that suggests that where you have in a parent application a term mentioned in every claim and then you take it out of the claims in the continuation, there's an argument that it's inherently there. It's inferred to be there because it was so commonly used. So that's the Saunders Group case, which is 492F1326. In other words, that was the title of what followed. Correct. So in that case you had a parent application that had a specific requirement, pneumatic cylinder that was in every single claim in the parent application. They filed a continuation application, and they took the term out of some of the independent claims but not all of them. And in that case, the Federal Circuit said, well, that's an indication that it's not required in the claims where it's omitted from. But here I think is the key passage from Saunders, and this is on 1332. The statement is, had they omitted the limitation from all the claims, it might be argued that the limitation was assumed to be present and did not need to be explicitly recited. That's the exact situation we have here. The parent application included the term passive infrared detector in all of the claims. It's replete throughout the specification. And then here when they filed the continuation, it didn't need to be recited expressly. It was found to be assumed to be in the claims. So I think that's exactly the situation we have here in that reasoning, or at least that passage from Saunders applies. If we look at the detailed description of the preferred embodiment, I think that's also instructive. There the passage says the wall control 60, as may best be seen in figure 4, includes a passive infrared sensor 100. So at every step of the process, from the abstract to the background, to the summary of the invention, to the detailed description, and every single figure, it repeatedly and consistently says that there's a passive infrared detector in the wall console. Are there other embodiments than the preferred embodiment? There are not. There are no other embodiments. There's no embodiments without the passive infrared detector. Every single figure refers to them. It's shown in figure 1, described in figure 1. It's shown explicitly in figure 4 and described in figure 4. Now figures 2 and 3 don't show it exactly, but if you look at the descriptions of figure 2, for example, it says it's a simplified block diagram showing the relationship between major electrical systems of a portion of the garage door operator shown in figure 1. So it's not surprising that figure 2 and figure 3, which only show a portion of the system from figure 1, may not have the infrared detector in them, but it's only a portion of figure 1 which indisputably has the infrared detector in the wall console. So when you have these types of descriptions where you've got consistent recitation, even just in the specification alone, we know from ultimate pointer, we know from the pacing technologies case, and we know from statements in polyamerica that those statements alone are sufficient to show disavowal. You don't need to go any further than that. Now here we think that there are additional supporting statements, including from the prosecution history, that support the disavowal, but I would argue that you don't even need to get there. The statements from the specification are so clear and so unambiguous that following ultimate pointer, following polyamerica, following pacing technologies, that the claims must be limited to having a passive infrared detector in the wall console. You think this is an... this invention is patent? I do. I do. When you look at everything from the abstract, I would go back to the first statement of the summary of the invention. The first statement in the summary of the invention says, a passive infrared detector for a garage door operator. I don't think you can get any clearer, more definitive statement than that. And if you don't mind. I just wanted to clarify and understand your response to Judge Wallach's earlier question. As I understand it, the result of the IPRs helps you on the workaround product, but not on the accused product, because claims 9 and 16 or something like that survive, right? Correct. And so what's the status of the appeal from the IPRs? So it's not been set for argument yet, but we have briefed it. And the brief is complete? I believe it is, yes, at this point, Your Honor. And you are correct. So the original design include a fully wired connection from the wall console to the head unit that allowed power to go back and forth. The redesign is outside the scope of that, so there's no issue, but it doesn't help us with the original design, Your Honor. You're correct. I'd like to reserve the rest of my time. I can save the rest for you. Mr. Bratcher. Thank you. I'd like to start by answering a question that came up about where the commission's claim construction wall console shows up. It's actually in an earlier opinion by the commission in which the commission reversed the ALJ's summary determination of non-infringement. But when you look at the patent, passive infrared detector as part of the wall control unit is all over this patent. It essentially says this invention is, and there are no alternative embodiments? Well, respectfully, I'd have to disagree. First of all, as the panel pointed out, the claims make no mention of the infrared detector. And secondly... But the question is, doesn't wall control unit in the claims mean in light of what's in this specification with the PID? Well, no, because not every embodiment discloses this infrared detector. For example, only one of the figures, figure 4, expressly shows an infrared detector and shows it in the wall console. None of the other figures, and I think there's another 18 figures, show an infrared detector. Yeah, but what Mr. White said is the other figures are showing only a portion of figure 1 or whatever. Well, figure 1 shows a wall console. It doesn't show an infrared detector in it, even though it does show another type of detector, an obstacle detector that's near the door. Figure 2 shows the wall console in a schematic, but it doesn't refer to an infrared detector. Now, there are references in the specification that refer to that detector, but it's not in any of the figures itself other than figure 4. So someone skilled in the art would look at these figures in the spec and say, well, maybe I can put it in, but maybe I can leave it out. And then that also brings up this point about what the invention is. And we have to look at the wording of the specification very carefully. It doesn't say the invention is putting a detector in the wall console. It says a principal aspect of the present invention or another aspect of the invention is to include a detector in the wall console. Well, that suggests there can be other embodiments or even leave the detector out altogether or perhaps position it someplace else in the garage other than in the wall console. Summary of the invention. Passive infrared detector for a garage door opener includes a section connected to a comparator. Both the detector and the comparator are controlled in a wall-controlled unit. Brief description. Figure 1 is a perspective view including a barrier operator with a PID in a wall-controlled unit and embodying the present invention. Detailed description of the preferred embodiment. There is no non-preferred embodiment, is there? Well, I disagree again. I mean, the figures don't show it. And what's more, in the prosecution history, when the applicants had to overcome a 112 rejection, they referred to a wall unit and a controller, like the claims, but they didn't cite any support for the infrared detector, even though they would have been required to if that was assumed to be part of the wall console. Moreover, I think it's important to look at this in the context of the 968 patent, which the panel brought up earlier. These two patents are related. The 968 patent issued first. It's the parent patent. They have the same specification? Same specification. And the other one was entitled PID in a wall-controlled unit? That's correct. That's in the title. It's in the claims. And the title is intended... Of course, the claims govern, but the title is intended to indicate what follows is the invention. And in the 968, that's what they did. They claimed both the wall console with the detector. But that's the same specification here. The same specification, but it's continuation practice, as the panel well knows, is to claim a different invention. It could overlap, certainly, but it's a different invention than what's in the 968. But if the title means something with respect to the specification, it means that that specification implies that same content with respect to the title. And that's true in the 968, but the 319... Things equal to the same thing are equal to each other. In the 319, there's no mention of an infrared detector in the title. It focuses more on the communication between the wall-controlled unit and the head unit. That's what the claims are directed to. Each unit has a controller. They communicate over wireless, excuse me, over a digital bus. You know, that's the whole focus of the 319 patent. The 968 is focused on a different aspect. It explicitly calls out the infrared detector. So could I bring you back to your point about the figures? Your basic argument is some of the figures, other than figure four, don't show the infrared detector. But if you look at column four of the patent, line 22, it says the wall-controlled 60, as may best be seen in figure four, includes a passive infrared sensor, which suggests to me that if you want to see what the wall-controlled unit includes, you look to figure four. Yeah, and I would agree that figure four discloses it, but I don't think it's the only embodiment, because why then would they have to claim the detector separately than the wall-controlled unit of the 968 patent? Well, I understand that's a different argument. I'm addressing the question of whether the fact that the other figures don't show an infrared detector has any significance. And it seems to me that where the spec says that the wall-controlled unit may be best seen in figure four, that suggests that that's the way, that's the place to look to get your description of the wall-controlled unit. Well, again, I think a person skilled in the art is going to look at the whole patent, starting with the claims, and see no reference to it. Well, that's a different point. It seems to me that this does undermine your reliance on these other figures not showing. Thank you for your time. Thank you, counsel. Ms. Vidal. Thank you, Your Honors. First, I would like to start with the fact that CGI does not dispute that there are two inventions disclosed in the patent, both the digital data bus and the passive infrared detector. And, in fact, if you read the entirety of the specification, including at column two, lines 36 to 51, including figures two, 3A to C, figure four, 12A to C, 12E to H, column 4, 60 to 6, column 6, 9, column 6, 65 to column 7, 32, there are a lot of embodiments that do not include the passive infrared detector. And that's for a good reason. So the underlying technology here is that CGI was replacing a single wire between a wall unit and an overhead unit to open the garage door, and it replaced that with a digital data bus. That enabled additional technology. That enabled one to include a passive infrared detector on the wall unit and an overhead light and have one enable the other, so that the PID could detect a person and turn on the light. Now, none of that is in the claims. Not only is the passive infrared detector not in the claims, that whole embodiment of turning on a light, the light's not in the claims. And all TTI is asking you to do is read that one limitation, passive infrared detector, into the claims and not the rest of that one particular embodiment. And if you look at the cases that are cited by TTI, TTI relied a lot on the Saunders case. I would just ask that the court read that case. We believe that case stands for a different proposition, that that case is more in a line with this court's decisions when it comes to claim differentiation. And here we had a parent application, a parent patent, that had a different title. It was titled passive infrared detector. We then have a child application where the applicant went back, as it's allowed to do, and decided to claim another invention that was in the patent. And in doing so, it changed the name of the patent, the title of the patent, to let the world... What was the other invention? In other words, one without the PID in the wall control unit. So there's two inventions. The parent application actually claimed a unit where the unit used a PID in the wall control unit. The invention of the patent issue is all about the digital data bus, the underlying technology that allowed more extensibility. In other words, that doesn't have anything to do with the PID in the wall control unit. It has nothing to do with that. The PID was there only to turn on the light. In other words, it's not another embodiment with respect to where the infrared PID is. So all of the sites that I provided to the court are examples where the PID is not in those sites and not in those figures. Now, I will say that the patent, in trying to explain why this digital data bus is important and why that provides additional extensibility to the garage door opener, does use over and over again the example of the PID with the light. And as I said, that is a separate invention. It clearly is, and it was separately patented. The claims of the other patent recite the PID. The title recites it. None of that is here. And importantly, if you look at the file history here, nowhere in the file history did the applicant try and distinguish their invention over the prior art based on the PID. In fact, if you look at the file history, there was a double patenting rejection where it would have been really easy for the applicant to say, we are not like this other patent because we have a PID in the claims. They did not do that. Instead, they filed a terminal disclaimer. If you look at the entirety of the file history, there was an enablement rejection, in which case a claim chart was submitted. There was reference back to the patent, but when the actual words were put in the file history, it referred to a wall console in the patent as being the wall console that was cited. It didn't say a wall console with a PID. There was no cite whatsoever in the file history to the PID. In fact, Poly America, which the district court thought supported TTI's position, actually supports CGI's position. It states the law, which this Court knows well under Thorner, that the standard for disavowal is exacting and there has to be clear and equivocal evidence of disavowal. At most, it's ambiguous. But the language, disinvention is, is in effect a disavowal. If that was the only language, that would be a much clearer case. But there's language on both sides. There's language to suggest that that's an invention. And in fact, everywhere else in the specification, it doesn't say disinvention is. It describes the PID as an embodiment. And so there were definitely two inventions. And yes, that language is in there, but only in one place. And everywhere else, it doesn't talk about the PID as being the invention. It also talks about the digital data bus as being the invention. And in this particular patent, only the digital data bus was claimed. And if you look at Poly America... Well, you say only the digital data bus was claimed, but the wall console was claimed, too. That's correct, Your Honor. So the question is, what does wall console mean? That's correct. And I use digital data bus as shorthand. So the claims actually recite the digital data bus as connecting the motor unit with the wall console. It never, none of the claims discuss that additional embodiment where you would put a light in the head unit and you would put a passive infrared detector in the wall unit. And in fact, just inserting that one portion of that embodiment into the claims, it's disconnected. There's no functionality for the PID because you don't have anything for it to impact. There's no light or anything else in the claims. So the claims were really directed to the underlying technology, which is the big differentiation of the prior art. We no longer have a wire. We now have a digital data bus where you can send different types of information, including, in the example in the patent, the information from a passive infrared detector. You've got negative five seconds to recite what you were just given. With that all said, thank you, Your Honor. All right. Thank you. Mr. White. Yes, Your Honor. You'll respond to the so-called second embodiment argument and the question of the other figures not disclosing the PID and the wall console? Yeah, let me start with that because, again, we heard that Figure 1, the argument was made that Figure 1 does not show a passive infrared detector. I would direct Your Honors to the description of Figure 1 in the brief description of the drawings on Column 3 of Appendix 766. It says, Figure 1 is a perspective view of a garage, including a movable barrier operator, specifically a garage door operator having associated with it a passive infrared detector in a wall control unit and embodying the present invention. So the suggestion that it's not in Figure 1, I don't know how you can make that argument in view of that description. Figure 2, which they've said does not show a passive infrared detector, that description there is a block diagram showing the relationship between major electrical systems of a portion of the garage door operator shown in Figure 1. Not a surprise that it's not there because it's not dealing with the wall console part of it. Figures 3A through C are schematic diagrams of a portion of the electrical system shown in Figure 2, which is, again, a portion of what's in Figure 1, but it doesn't say that there's no passive infrared detector. And as Judge Dyke pointed out, Figure 4 is a schematic diagram of the wall console, including the passive infrared detector. There is no other embodiment. You looked at the description, I think you pointed out to me, the heading of the specification is Detailed Description of the Preferred Embodiment. There is one. There is only one. We heard an argument that another embodiment supposedly involves a digital data bus. Well, the question isn't whether there's another preferred embodiment, but whether there's another embodiment at all. And I think the answer to that is clearly no. We heard a description... And Ms. Bacow is telling us there was. I know. Where do you find it? Look for the description of a digital data bus anywhere in the specification. That term appears in the claims, but you won't find it described in the specification. Where is it? Look for it. The section she pointed you to, Column 2, talks about the microcontroller also communicates over the lines carrying the normal wall control switch signals. That doesn't say in this embodiment there's no passive infrared detector. This follows two paragraphs in the summary of the invention that start with describing the passive infrared detector. Both of the paragraphs say passive infrared detector, passive infrared detector. Then they say the microcontroller also communicates with something else. It doesn't say there's no passive infrared detector in this embodiment. You will not find an embodiment in the patent that does not have a passive infrared detector. She said we didn't claim... We didn't ask that a light be read into the claims. Well, of course not. We're not trying to read things into the claims. We're interpreting what is claimed, which is the wall console. That includes a passive infrared detector. There was no suggestion that a passive infrared detector or that the wall console includes a light or that the light was an important part of the invention. It just isn't there. The specification is enough. As we know from the case law, where you recite consistently and repeatedly that the invention includes a passive infrared detector in the wall console, if you repeatedly extol the virtues of including a passive infrared detector in the wall console, and if you repeatedly criticize including a passive infrared detector in the head unit instead of in the wall console, ultimate pointer, polyamerica, they all tell us that that is a disavowal and the claims need to be limited. I want to answer Judge Wallach's question before. The claim construction ruling is at appendix site 5287 through 5304. Before I sit down, I just wanted to flag the issue that we raised in our Rule 28J letter and that there's an issue about whether or not this supposed alternative holding applies here. I just ask your honors to take a look at that letter and what the relief requested in there, if you're going to agree with Chamberlain on this one. Thank you, Counsel. We could say this case isn't open and shut, but we won't. The case is submitted. It had its ups and downs. All rise. The Honorable Court has adjourned.